## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                     Case No. 14-cr-233(2) (ADM/TNL)

                Plaintiff,

v.                                            **REPORT &**
                                              **RECOMMENDATION**
Karin Florentino Jaime-Perez,

                Defendant.

Benjamin Bejar, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Alberto O. Miera, Miera Law Office, 956 Birch View Court, St. Paul, MN 55119 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence (ECF No. 17). This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Ann D. Montgomery, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3).

A hearing was held on August 22, 2014. Assistant United States Attorney Benjamin Bejar appeared on behalf of the United States of America (the Government). Attorney Alberto O. Miera appeared on behalf of Defendant.

The Court heard testimony from Trooper Douglas Rauenhorst of the Minnesota State Patrol. The Court received the following exhibits: Government Exhibit 1, two

DVDs[1] of the traffic stop at issue;  Government Exhibit 2, a photograph of objects held in place to show how the objects were suspended from a rearview mirror; Government Exhibits 3, 4, 5, and 11, photographs of air fresheners in a vehicle and a key in the ignition; Government Exhibit 6, a photograph of a white sweatshirt and two small bags in the rear of a vehicle; Government Exhibit 7, a photograph of a handbag and the identification cards of Co-Defendant Olga Margarita Valencia; Government Exhibit 8, a photograph of Defendant's non-government-issued "Nebraska" identification card; Government Exhibit 9, a copy of the "Minnesota State Patrol Consent to Search" form signed by Valencia; Government Exhibit 10, a copy of the "Violation Report" issued for objects being suspended from a rearview mirror; Government Exhibit 12, a printout of the Nebraska Department of Motor Vehicles registration for a red 2004 Ford Expedition; Government Exhibit 13, a printout of the Nebraska Department of Motor Vehicles historical record for a red 2003 Ford Expedition; Defendant Exhibit A, a flyer for AmeraCard Enterprises, Inc. identification cards; and Defendant Exhibit B, a demonstrative photograph of items hanging from a rearview mirror.

Post-hearing briefing is now complete and this motion is ripe for a determination by the Court.

## I.

Based upon the file and documents contained therein, along with the testimony presented and exhibits received, the undersigned Magistrate Judge makes the following:

---

[1] The DVDs are labeled as "1 of 2" and "2 of 2."  (Gov't Ex. 1.)  The Court will refer to them as "DVD 1" and "DVD 2," respectively.  DVD 2 is a continuation of the traffic stop begun in DVD 1.

## FINDINGS

Trooper Rauenhorst is a licensed peace officer and has been with the Minnesota State Patrol for 18 years. (Tr. 10.) In his current position, he performs regular patrol and canine duties. (Tr. 10.) Before working with the Minnesota State Patrol, Trooper Rauenhorst was a member of the Drug Task Force for the Blue Earth County Sherriff's Department, worked for two years with the Janesville Police Department, and served as a criminal investigator for the United States Marine Corps. (Tr. 10.) Trooper Rauenhorst has an associate's degree and a bachelor's degree from Mankato State. (Tr. 11.) Trooper Rauenhorst has also received skills training from Hibbing Technical College, the "MP school," and the United States Marine Corps. (Tr. 11.) Trooper Rauenhorst has received additional training related to controlled substances and the trafficking thereof, including the "covert drug investigations school; DEA school; [and] Desert Snow training." (Tr. 11.) Through this training, Trooper Rauenhorst was instructed on types of controlled substances, different trafficking routes, methods of concealing controlled substances in passenger and commercial vehicles, and common indicators of drug trafficking on the highways. (Tr. 11, 12-13.) In particular, one of the "Desert Snow" training sessions covered over 200 hidden compartments, or "hides," for concealing controlled substances and contraband in passenger vehicles. (Tr. 11, 12.) Trooper Rauenhorst also participated in a training session covering hides in commercial vehicles. (Tr. 12.)

Through his training and experience, Trooper Rauenhorst has become aware of some common indicators of drug trafficking on the highways. (Tr. 12, 13.) One of these indicators is the use of third-party vehicles or recently purchased vehicles. (Tr. 13.)

Hidden compartments are often placed inside the vehicle, the vehicle is used to run drugs, and then the vehicle is discarded within a short period of time.  (Tr. 13.)  A vehicle's registration is therefore important.  (Tr. 13.)  Other common indicators are the use of "masking agents" to conceal the odor of narcotics, such as fragrance, laundry detergent, fabric softener, and dryer sheets, and the presence of air-tight bags, such as heat-sealed or food-saver bags.  (Tr. 13, 14.)  Trooper Rauenhorst testified that masking agents are used in an effort to conceal the odor of narcotics from both human and canine officers.  (Tr. 14.)  Trooper Rauenhorst also testified that substantial amounts of cash are also significant because most narcotics transactions are cash transactions.  (Tr. 36.)  Trooper Rauenhorst testified that a particular indicator occurring by itself may have an innocent explanation.  (Tr. 97.)

Trooper Rauenhorst has also been a canine handler since 1999 and works with his canine, Diesel, who is trained to detect narcotics.  (Tr. 14.)  Diesel is certified every year with the United States Police K9 Association and was nationally certified in May 2014. (Tr. 14.)  Diesel "placed 6th in Nationals."  (Tr. 14.)  Trooper Rauenhorst testified that masking agents generally do not interfere with the canine's ability to detect the presence of narcotics.  (Tr. 15; *see* Tr. 57-58, 94.)

On June 5, 2014, Trooper Rauenhorst was patrolling the area of Interstate 35 between Albert Lea and Owatonna, Minnesota.  (Tr. 15.)  Trooper Rauenhorst was monitoring traffic, including observance of the speed limit, vehicle equipment, and observance of Minnesota traffic laws.  (Tr. 15-16.)  At approximately 10:40 a.m., Trooper Rauenhorst spotted a red Ford Expedition with "objects hanging down from the

rearview mirror in view of the driver and the windshield." (Tr. 17.) With certain exceptions not applicable here, the suspension of an object between the driver and the windshield of a motor vehicle is prohibited by Minnesota law. (Tr. 17.) Minn. Stat. § 169.71, subd. 1(a)(2). Trooper Rauenhorst observed what "[l]ooked like strings or possibly beads . . ." hanging down. (Tr. 18.)

Trooper Rauenhorst turned on his emergency lights and pulled over the Expedition. (Tr. 19, 21.) When Trooper Rauenhorst turned on his emergency lights, the video equipment in his squad car activated. (Tr. 19.) The recording equipment is such that it "backs up" to one minute prior to the switching on of the emergency lights and begins recording from that point forward. (Tr. 19; *see* Gov't Ex. 1, DVD 1.)

Trooper Rauenhorst approached the Expedition on the passenger side and spoke to the occupants. (Tr. 21.) There were four occupants in the vehicle: a male driver, a front female passenger, and two rear male passengers who appeared to be in their teens. (Tr. 21, 22; *see* Tr. 64.) Trooper Rauenhorst also observed an approximately two-inch cloth square on a string and beads resembling a rosary hanging down from the rearview mirror. (Tr. 23, 24, 25; *see* Tr. 65-66; *see* Gov't Ex. 2.) The driver appeared nervous, kept looking down and away, and would not maintain eye contact with Trooper Rauenhorst. (Tr. 23.)

Additionally, Trooper Rauenhorst noticed the "strong odor of air freshener stemming from inside the vehicle." (Tr. 31; *see* Gov't Ex. 1, DVD 1.) Trooper Rauenhorst observed several air fresheners in the Expedition, including in the dash vent, hanging from the steering column, and hanging in the rear of the vehicle. (Tr. 32; *see*

5

Gov't Exs. 3, 4, 5, 11.)  In total, there were approximately six to seven air fresheners in the Expedition.  (Tr. 33.)

Trooper Rauenhorst also noticed that, other than the ignition key, no other keys were present on the key ring, such as a house key or key for another vehicle.  (Tr. 34; *see* Gov't Ex. 11.)  Trooper Rauenhorst testified that a single key in the ignition is significant in drug trafficking because an organization will purchase the vehicle, use it for a short time, and then discard the vehicle.  (Tr. 35.)  Because the vehicles are just being used to transport narcotics and not "for personal use," "there's no other reason to have a regular house key, other vehicle keys or anything like that."  (Tr. 35.)  Similarly, Trooper Rauenhorst observed that the Expedition had new rear tires.  (Tr. 48.)  Trooper Rauenhorst testified that "[a] lot of these organizations, they don't want the vehicles to break down and they are in good mechanical order."  (Tr. 48.)

The female passenger was identified by a Nebraska driver's license as Valencia. (Tr. 22.)  Valencia told Trooper Rauenhorst that she and Defendant were married and they were traveling from Omaha to visit the Mall of America.  (Tr. 28, 29, 34-35; Gov't Ex. 1, DVD 1.)  When Valencia reached into her purse to get her driver's license, Officer Rauenhorst noticed "a significant amount" of cash in the purse.  (Tr. 36, 76; *see* Gov't Ex. 1, DVD 1.)  Valencia also produced a California driver's license and a permanent resident card.  (Tr. 38; Gov't Ex. 7.)  Trooper Rauenhorst was also able to determine that the Expedition was purchased in mid-May and registered to Valencia at the end of May. (Tr. 40; *see* Gov't Ex. 12.)

Defendant, the driver, produced a non-government-issued "Nebraska" identification card and a Mexican driver's license, which appeared to be current. (Tr. 22-23, 25, 26-27, 69, 70, 71, 93; *see* Gov't Ex. 8.)   Trooper Rauenhorst testified that Defendant's identification card "didn't appear to be real" and would not return any information when he attempted to run the card through his magnetic card reader. (Tr. 25, 27; *see* Gov't Ex. 1, DVD 1.)   Trooper Rauenhorst tried entering Defendant's name and date of birth as well as the number on the identification card, none of which "c[a]me back on file." (Tr. 25-26.)

Trooper Rauenhorst also learned from Valencia that Defendant had been in the country for two years and had a passport at home in Nebraska. (Tr. 29, 30; *see* Tr. 76; Gov't Ex. 1, DVD 1.)   Valencia told Trooper Rauenhorst that she worked at T.J. Maxx and Defendant worked construction. (Tr. 29.)   When asked why the address on her driver's license and Defendant's identification card were different, Valencia responded that the correct address was the address on her driver's license. (Tr. 29, 93.)   It also appeared that there was no luggage in the Expedition. (*See* Tr. 37, 38, 84-87, 91-92.)

Trooper Rauenhorst subsequently tried to verify some of the information supplied by Valencia through the El Paso Intelligence Center ("EPIC") database. (Tr. 30.)   EPIC is a database containing information from different agencies including Immigration and Customs Enforcement, the Drug Enforcement Administration, and the Federal Bureau of Investigation.[2]   (Tr. 30.)   EPIC contains information on active investigations as well as

---

[2] "EPIC is a mass intelligence center comprised of approximately 20 to 25 computer databases from the federal government, including such entities as the INS, DEA, and FBI."  *United States v. Guerrero*, 374 F.3d 584, 587 n.3 (8th Cir. 2004).

entries into the United States.  (Tr. 30-31.)  EPIC also did not return any information regarding Defendant.  (Tr. 31.)

Significant to the totality of the circumstances in this case, Trooper Rauenhorst did learn additional information regarding Valencia from EPIC.  (Tr. 39.)  Trooper Rauenhorst learned that, in February, a red Ford Expedition registered to Valencia was stopped in Colorado on its way to California.  (Tr. 39.)  During the stop, law enforcement seized $16,000 cash.  (Tr. 39.)  The dispatcher told Trooper Rauenhorst that the Ford Expedition involved in the February stop had only "temporary registration."   (Tr. 40.)  Based on the information he received at the time, Trooper Rauenhorst believed the Expedition stopped in February and the Expedition involved in his traffic stop were the same vehicle.[3]  (Tr. 40.)

Trooper Rauenhorst then tried verifying Defendant's identity by fingerprint through IBIS, an electronic database that is linked to the Minnesota Bureau of Criminal Apprehension.  (Tr. 27-28, 39, 72; *see* Gov't Ex. 1, DVD 1.)  Trooper Rauenhorst also did not receive any results through IBIS.  (Tr. 28, 73.)  Trooper Rauenhorst asked Defendant if he had any other identification on him and Defendant stated he did not. (Gov't Ex. 1, DVD 1.)

Based on his observations and the information he had acquired, including the EPIC information concerning the Expedition stopped in February and that vehicle's California destination (a location which Trooper Rauenhorst testified is a "source" for

---

[3] The following day, an EPIC operator called Trooper Rauenhorst back and told him that the VIN number of the Expedition he stopped did not match the VIN number of the Expedition stopped in February.  (Tr. 41.)  It was ultimately determined that the Expedition stopped in February was a 2003 model and the Expedition stopped by Trooper Rauenhorst was a 2004 model.  (Tr. 41; *see* Gov't Ex. 13.)

illegal contraband) as well as the absence of information concerning Defendant's entry into the United States, Trooper Rauenhorst believed that there was illegal contraband, specifically narcotics, in the Expedition he stopped.  (Tr. 44, *accord* Tr. 92.)  Trooper Rauenhorst completed the traffic stop and issued a written warning to Defendant.  (Tr. 44, 45; Gov't Ex. 1, DVD 1; Gov't Ex. 10.)  Trooper Rauenhorst confirmed that he had given "everything back" to Defendant and Valencia.  (Gov't Ex. 1, DVD 1.)

At this point, Defendant and Valencia were standing behind the Expedition, between the Expedition and Trooper Rauenhorst's squad.  (Tr. 45; Gov't Ex. 1, DVD 1.)  Trooper Rauenhorst asked Valencia whether there was anything illegal in the car, such as drugs or large amounts of currency.  (Tr. 89; Gov't Ex. 1, DVD 1; *see* Tr. 45.)  Valencia responded that there was not and Trooper Rauenhorst could "go ahead and check."  (Tr. 89; Gov't Ex. 1, DVD 1; *see* Tr. 45.)  Trooper Rauenhorst gave Valencia a "Minnesota State Patrol Consent to Search" form, which contains consent authorizations in both the English and Spanish languages.  (Tr. 46; Gov't Ex. 1, DVD 1; Gov't Ex. 9.)  Trooper Rauenhorst asked Valencia if she is able to read English and Valencia responded that she can read both English and Spanish and signed the form.  (Tr. 46; Gov't Ex. 1, DVD 1; Gov't Ex. 9.)  Trooper Rauenhorst testified that he asked for consent to search the Expedition based on his observations and the "totality of the circumstances."  (Tr. 50, 91-92.)

After receiving Valencia's consent to search the vehicle, Trooper Rauenhorst retrieved Diesel from his squad and ran Diesel around the Expedition.  (Tr. 50, 51; *see* Gov't Ex. 1, DVD 1.)  Diesel positively alerted to the odor of narcotics near the front of

the vehicle.  (Tr. 50, 51; *see* Gov't Ex. 1, DVD 1.)  Trooper Rauenhorst then returned

Diesel to his squad and placed Defendant and Valencia in his squad and the two other

passengers in the squad of another trooper. (Tr. 51; *see* Gov't Ex. 1, DVD 1.)

Next, Trooper Rauenhorst made a "cursory search" of the vehicle.  (Tr. 52.)

During his search he discovered additional air fresheners, two bottles of Febreeze brand

air fresheners, another aerosol air freshener, and dryer sheets. (Tr. 52.)  Other than two

small bags in the back, there was no luggage in the Expedition.  (Tr. 52; *see* Tr. 37, 82-

83, 85; Gov't Ex. 6.)  Trooper Rauenhorst testified that one bag contained primarily

make-up and the other bag contained a small amount of female clothing. (Tr. 52, 85, 86,

87, 98.)  Officer Rauenhorst also observed a single "sweatshirt hanging from the rear and

that was it."  (Tr. 35; *see* Gov't Ex. 6.)  In addition, Trooper Rauenhorst observed

medium-sized resealable bags in a rear door pocket.  (Tr. 53.)

Trooper Rauenhorst subsequently had the vehicle towed to another location for

"safety reasons," where it was more thoroughly searched. (Tr. 54.)  While the vehicle

was being searched, Defendant, Valencia, and the two other passengers were "released"

to a McDonald's restaurant.  (Tr. 54; *see* Gov't Ex. 1, DVD 2.)  Approximately 90

minutes later, 20 pounds of methamphetamine was found hidden in the second and third

seats of the Expedition.  (Tr. 54, 55, 56.)  Defendant and Valencia were then arrested.

(Tr. 54-55, 56.)

At the hearing, Trooper Rauenhorst acknowledged that many people have air

fresheners in their vehicles and sometimes, rather than take down a weak air freshener,

people will just add another air freshener, resulting in multiple air fresheners in the

vehicle.  (Tr. 59-60.)   When asked, based on his training and experience, whether Trooper Rauenhorst had become aware or noticed that Hispanic individuals used air fresheners in greater quantities than the "average" Caucasian person, Trooper Rauenhorst responded that he had not noticed any difference.  (Tr. 60-61.)  Trooper Rauenhorst also testified that the indicators of drug trafficking discussed in his training sessions were common indicators, meaning that they applied "equally to everyone" no matter the person's race or nationality.  (Tr. 62, 94-95.)

On cross examination, Trooper Rauenhorst was asked about a logo appearing on Defendant's identification card: "a flying eagle with an American flag and underneath it[,] it reads 'Amer[aC]ard.'"  (Tr. 67; *see* Gov't Ex. 8; Def. Ex. A.)  Trooper Rauenhorst was asked whether he noticed this logo when he ran Defendant's identification card during the traffic stop.  (Tr. 67.)  Trooper Rauenhorst responded that he had not noticed it and had been focused on the "big letters [stating] 'Nebraska identification card.'"  (Tr. 67.)  Trooper Rauenhorst also testified that the logo could be covered up depending on how the identification card is held.  (Tr. 67.)  Trooper Rauenhorst testified that he had seen commercially available, non-governmental identification cards similar to the identification card provided by Defendant before and they are often used by individuals with outstanding warrants or who are undocumented.  (Tr. 73, 74.)  Trooper Rauenhorst also testified that he did not have any way of verifying the authenticity of a Mexican driver's license.  (Tr. 72, 95; *see* Tr. 70-71.)

Trooper Rauenhorst testified that at no point in the encounter did he tell Defendant and Valencia that they were free to leave.  (Tr. 90, 91.)

## II.

Based upon the foregoing Findings, the undersigned makes the following:

## CONCLUSIONS OF LAW

Defendant does not dispute that Trooper Rauenhorst stopped him for a violation of Minnesota law. It is "well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) (quotation omitted); *accord United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) ("An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop is consistent with the Fourth Amendment."). Rather, Defendant moves for suppression of the evidence found in the Expedition on grounds that Trooper Rauenhorst impermissibly expanded the scope of the traffic stop.

> After a law enforcement officer initiates a traffic stop, the officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary.

*United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (quotation and citations omitted). "A police officer may undertake similar questioning of the vehicle's occupants to verify the information provided by the driver." *Linkous*, 285 F.3d at 719.

"[O]nce an officer finishes the tasks associated with a traffic stop, [however], the purpose of the traffic stop is complete and further detention would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable

suspicion to justify further detention." *United States v. Ovando-Garzo*, 752 F.3d 1161, 1163-64 (8th Cir. 2014) (quotation omitted).   When an officer's observations arouse reasonable suspicion, the officer is "entitled to expand the scope of the stop and ask questions not directly related to the initial traffic stop." *United States v. Gomez Serena*, 368 F.3d 1037, 1040 (8th Cir. 2004).

"The Supreme Court has described reasonable suspicion as a particularized and objective basis for suspecting criminal activity.   Whether an officer has reasonable suspicion to expand the scope of the traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience."   *Linkous*, 285 F.3d at 720 (quotations and citations omitted).   "To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."   *Shafer*, 608 F.3d at 1062 (quotation omitted). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together. An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *Linkous*, 285 F.3d at 720 (citation omitted); *see Gomez Serena*, 368 F.3d at 1041 ("An investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop.").

> Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops.  When there are complications in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine.

*United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007); *see Ovando-Garzo*, 752 F.3d at 1164 ("Whether a detention is reasonable is a fact-intensive question which is measured in objective terms by examining the totality of the circumstances." (quotation omitted)).

Defendant argues that the evidence obtained during the search of the Expedition should be suppressed for three reasons: (1) Trooper Rauenhorst did not take into account cultural differences when evaluating the totality of the circumstances; (2) Trooper Rauenhorst improperly expanded the traffic stop; and (3) Valencia did not voluntarily consent to the search of the Expedition.  (Def.'s Mem. in Supp. at 9-18, ECF No. 33.)

## A. Accounting for Differences

Defendant asserts that Trooper Rauenhorst "willfully ignor[ed] cultural differences" when making observations after the initial traffic stop.  (*Id.* at 11.) Defendant asserts:

> A Mexican hanging a rosary and having multiple air fresheners may be a petty misdemeanor but it does not constitute a crime nor grounds to suspect a crime.  It is reasonable for them to carry cash, travel with light luggage when they were driving six hours to a major mall, and carry a Mexican driver's license, all of which are legal.  The Trooper cast such a wide net that he could virtually search any Mexican's car based on reasonable suspicion.

14

(*Id.* at 10.)   Defendant cites *United States v. Garcia*, 23 F.3d 1331 (8th Cir. 1994), in support of his argument.

The Government responds that Defendant's argument appears to be that "hanging a rosary from a rearview mirror, having multiple air fresheners in a vehicle, carrying significant amounts of cash, traveling with 'light luggage' on a six-hour, one-way trip, and possessing only a Mexican driver's license cannot constitute indicia of reasonable suspicion *when the driver is a Mexican national*."   (Gov't's Opp'n at 9, ECF No. 34.) The Government contends that, "[t]aken to its logical conclusion, . . . [D]efendant's proposition would mean that the same indicia could support reasonable suspicion only against a *non-Mexican* motorist."   (*Id.*)   Additionally, the Government contends that Defendant's argument is contrary to the Eighth Circuit's holding in *Garcia* regarding the use of nationality as a basis for reasonable suspicion.  (*Id.* at 10-11.)

The Government further argues that Trooper Rauenhorst did not know the nationality of the Expedition's occupants when he lawfully stopped the vehicle for violating a Minnesota traffic law and Trooper Rauenhorst's testimony shows that "his narcotics-common-indicator training properly did not tout suspects' nationalities as an indicator, and that he properly treats all motorists equally in looking for indicators, regardless of their cultural background."  (*Id.* at 10.)  The Government argues that "[a]ny other circumstance, whether emphasizing or ignoring common indicators based on a suspect's cultural background or ethnicity, would smack of invidious discrimination and constitute a blatant violation of Equal Protection guarantees."  (*Id.* at 10-11.)

15

Defendant is essentially arguing that Trooper Rauenhorst was not justified in extending the traffic stop because he observed only innocent, legal behavior, behavior made all the more innocent because such behavior is allegedly common among persons of Defendant's nationality.  But,

> [t]he behavior on which reasonable suspicion is grounded need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances.  Thus, factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent.  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.

*United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) (quotations and citations omitted).  Similarly, "conduct which would be wholly innocent to the untrained observer might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection."  *Garcia*, 23 F.3d at 1335 (quotation omitted).  Accordingly, the fact that Trooper Rauenhorst's suspicion of criminal activity was based on behaviors which individually may be wholly innocent does not render his suspicion unreasonable when such behaviors occur in the aggregate, regardless of nationality or race.

*Garcia* involved two traffic stops.  23 F.3d at 1334.  The first traffic stop occurred after a state trooper observed a truck swerving three times onto the shoulder.  *Id.* at 1333. During the stop, the passenger presented the trooper with an alien identification card, indicating that he was a Mexican national and, at times, the driver and the passenger

16

conversed with one another in Spanish. *Id.* After the traffic stop was completed and the truck permitted to continue on its way, the trooper received additional information from EPIC concerning the passenger's arrest history and had another trooper stop the truck for a second time in order to talk with the occupants. *Id.* Among other things, the passenger's nationality and the fact that the driver and passenger were talking with one another in Spanish during the first traffic stop were cited as part of the articulable facts supporting reasonable suspicion of criminal activity to justify the second traffic stop. *Id.* at 1334-35. The Eighth Circuit held that these facts did not support reasonable suspicion of criminal activity. *Id.* at 1336. The Eighth Circuit noted that "[a]lthough nationality or race may be relevant factors in some instances, for example when they are used to establish identity, their relevance in this case is unclear." *Id.* at 1335 (citation omitted). The Eighth Circuit observed that there was "no evidence that Mexican citizens are any more or less likely to transport illegal drugs than native born or naturalized citizens of the United States. The fact that [the passenger] was carrying a Mexican identification card does not implicate him in illegal activity." *Id.*

Defendant correctly recognizes that *Garcia* cautions against using nationality as a basis for reasonable suspicion of criminal activity. (Def.'s Mem. in Supp. at 10.) Indeed, Trooper Rauenhorst specifically testified that, in his training and experience, the common indicators of drug trafficking apply regardless of race and/or nationality. Yet, Defendant asserts that Trooper Rauenhorst should have taken his nationality into account—one of the very facts the Eighth Circuit rejected as a proper basis for reasonable suspicion of criminal activity. *Garcia* is inapposite and the Court is not persuaded that Trooper

Rauenhorst should have considered Defendant's nationality in evaluating the circumstances before him, particularly when, according to his training and experience, this fact was irrelevant.

### B. Expansion of the Traffic Stop

Next, Defendant argues that Trooper Rauenhorst improperly extended the length of the traffic stop because he "took a fairly extensive delay in investigating to determine reasonable suspicion," observed only innocent behaviors not warranting reasonable suspicion of criminal activity, and used the inability to run Defendant's identification card as pretext to search the vehicle when Defendant produced a valid Mexican driver's license. (*Id.* at 12-15.)

The Government contends that Trooper Rauenhorst was entitled to conduct an investigation and complete routine tasks related to the traffic stop, including computer checks to verify Defendant's identification and criminal history as well as ask questions of the vehicle's occupants and verify the information provided. (Gov't Opp'n at 11-13.) The Government also contends that the "valid[ity]" of Defendant's Mexican driver's license is of no moment because Trooper Rauenhorst testified that he was unable to verify a foreign driver's license. (*Id.* at 13.) Without conceding that the EPIC check expanded the scope of the traffic stop, the Government contends that, in any event, Trooper Rauenhorst had reasonable articulable suspicion to run the EPIC check based on the totality of the circumstances. (*Id.* at 13-16.)

As stated above, in connection with the traffic stop, Trooper Rauenhorst was permitted to detain Defendant while performing the routine tasks of checking the

Expedition's registration and Defendant's license and criminal history as well as preparing the written warning for the suspended objects.  *See Quintero-Felix*, 714 F.3d at 567.   While performing these tasks, Trooper Rauenhorst was also permitted to ask the passengers in the Expedition "routine questions, such as the destination and purpose of the trip, and . . . act on whatever information the [passengers] volunteer[ed]."  *Olivera-Mendez*, 484 F.3d at 509.   The Eighth Circuit has recognized that this process can be time-consuming, particularly when the circumstances of the traffic stop result in "complications in carrying out the traffic-related purposes of the stop."  *Olivera-Mendez*, 484 F.3d at 510; *see also Quintero-Felix*, 714 F.3d at 567.

Here, the delay was the result of Trooper Rauenhorst's efforts to verify Defendant's identity.   "As [the Eighth Circuit] ha[s] repeatedly recognized, checking a driver's identification is one of the routine but somewhat time-consuming tasks related to the traffic violation that an officer is permitted to conduct in the course of a traffic stop."  *United States v. Roberts*, 687 F.3d 1096, 1100 (8th Cir. 2012) (quotation omitted).  Trooper Rauenhorst testified that he was not able to confirm Defendant's identity by running his identification card through his card reader; no information was returned when he tried running Defendant's name, date of birth, and the identification number; and he was not able to confirm the validity of Defendant's Mexican driver's license.[4]  When he was not able to obtain information through more traditional routes, Trooper Rauenhorst tried other databases available to him in order to verify Defendant's identity.   The delay

---

[4] Defendant asserts that "even a cursory review of the driver's license would reveal that the photo identified the driver and that the license was authentic."   (Def.'s Mem. in Supp. at 17.)   The Court notes that the Mexican driver's license Defendant provided to Trooper Rauenhorst was not introduced into evidence.

resulting from attempting to identify the vehicle's driver was not unreasonable in light of the irregular circumstances. *See Olivera-Mendez*, 484 F.3d at 510 (officer's need to sort through conflicting information regarding driver and vehicle, including vehicle's registration in one state, licensure in a second, and driver's residence in a third, as well as incomplete vehicle documentation presented "unusual circumstances" warranting delay); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) ("Any delay caused by the multiple computer checks of the ID was necessary to [officer's] legitimate investigation, as [passenger] had been intentionally evasive about his identity by providing the fake ID.").

While Trooper Rauenhorst was completing the routine tasks attendant to the traffic stop, he noticed several things causing him to be suspicious that criminal activity was afoot, including the strong odor of air freshener, Defendant's nervousness when interacting with Trooper Rauenhorst, the "significant amount" of cash possessed by Valencia, the inconsistency between the addresses listed on Defendant and Valencia's identification despite the fact that they supposedly were married for two years and living together, the apparent absence of any luggage despite the interstate travel plans of the Expedition's occupants, and the presence of a single ignition key on the key fob. Important to the totality of the circumstances in this case, the EPIC check yielded additional information increasing Trooper Rauenhorst's suspicion of this particular vehicle's involvement in criminal activity. Based on these facts and Trooper Rauenhorst's inability to identify Defendant, Trooper Rauenhorst had reasonable suspicion of illegal narcotics activity. *See, e.g.*, *United States v. Briasco*, 640 F.3d 857,

20

859-60 (8th Cir. 2011) (reasonable suspicion of illegal drug trafficking existed where car had strong odor of air freshener, occupants claimed trunk was empty despite luggage on back seat and sagging appearance, driver was increasingly nervous in interactions with law enforcement and failed to give full information regarding criminal history, and vague descriptions of travel plans); *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) ("patriotic magnet on a rental car, newer lock on the U-Haul trailer, [driver's] DEA cap, inconsistent INS/Homeland Security credentials [displayed by driver], air freshener, and [driver's] nervousness" supported suspicions   unrelated to traffic offense prompting stop); *cf. Guerrero*, 374 F.3d at 587, 590 (presence of several air fresheners, driver's nervousness and inconsistent and limited details about trip, and EPIC check showing driver was "flagged" by INS and "DEA had participated in a cocaine transaction at [driver's] home address" did not amount to reasonable suspicion under totality of the circumstances because air fresheners showed driver either liked the smell or was trying to cover an odor, nervousness is of limited significance, inconsistent and limited travel details were result of language barrier, and trooper did not follow up on EPIC information).  When an "officer[] develop[s] reasonable suspicion while conducting the normal tasks of the stop,  . . . the scope of the stop [i]s not unreasonably expanded." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009).

Again, Defendant argues that the factors identified by Trooper Rauenhorst "involve[] a series of innocent behaviors" and Trooper Rauenhorst's testimony regarding the odor of air fresheners is not credible.  (Def.'s Mem. in Supp. at 13.)  "Though any one of these factors alone would not rise to reasonable suspicion, when combined and in light

of [Trooper Rauenhorst's] training and experience, they created a reasonable, articulable suspicion that [Defendant] was carrying contraband." *Briasco*, 640 F.3d at 860; *accord Linkous*, 285 F.3d at 720; *see United States v. Fuse*, 391 F.3d 924, 930 (8th Cir. 2004) (strong odor of air freshener, driver's prior arrest, and extreme/unusual nervousness of driver and passenger throughout traffic stop amounted to reasonable suspicion justifying continued detention); *United States v. Lara*, No. 06-cr-315-09 (DSD/FLN), 2007 WL 3144998, at *5 (D. Minn. Oct. 24, 2007) (reasonable articulable suspicion existed justifying greater intrusion unrelated to traffic offense where driver displayed facial reaction and made quick exit in response to presence of squad car, strong odor of air fresheners present, driver did not have a driver's license and appeared nervous, car did not belong to driver, and key ring contained a single key).

In support of his argument, Defendant relies on *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). In *Beck*, the following facts were cited in support of Beck's continued detention following completion of a traffic stop:

> (1) Beck was driving a rental car which had been rented by an absent third party; (2) the Buick was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage in the passenger compartment of the automobile; (5) Beck's nervous demeanor; (6) Beck's trip from a drug source state to a drug demand state; and (7) Officer Taylor's disbelief of Beck's explanation for the trip.

140 F.3d at 1137. Under the "unique circumstances of th[e] case," the Eighth Circuit concluded that the above-identified factors did not generate reasonable suspicion for Beck's continued detention following completion of the traffic stop. *Id.* at 1139-40.

22

Defendant contends that the absence of luggage, Beck's nervousness, and the officer's disbelief in Beck's travel plans are analogous to the present case. (*See* Def.'s Mem. in Supp. at 13-14.) Here, however, Trooper Rauenhorst had a firmer factual basis for his reasonable suspicion. In addition to the absence of luggage, Defendant's nervousness, and any subjective disbelief Trooper Rauenhorst may have had with the Mall of America story, Trooper Rauenhorst (1) smelled the strong odor of air freshener, which the Court credits, especially in light of exhibits received showing at least four air fresheners present in Expedition at the time of the stop; (2) was unable to confirm the identity of the driver; (3) found it odd that a couple that had been purportedly married for two years and living together would have different addresses on their identification; (4) observed a "significant amount" of cash in Valencia's purse; and (5) received information that a vehicle registered to Valencia of the same color, make, and model as the vehicle he stopped was previously involved in a traffic stop in which a large quantity of cash confiscated.[5] *See Fuse*, 391 F.3d at 930 (driver's prior arrest, presence of strong odor of air fresheners, and extreme nervousness of driver and passenger throughout traffic stop created "combination of suspicious factors . . . stronger than in *Beck*").

Defendant also relies on *United States v. Yousif*, 308 F.3d 820 (8th Cir. 2002). (Def.'s Mem. in Supp. at 13-14.) *Yousif* is distinguishable, however, because the stop of Yousif's vehicle itself, the product of an unconstitutional drug-interdiction checkpoint, was illegal. 308 F.3d at 829. Here, there is no dispute that Defendant was legally stopped due to a violation of a Minnesota traffic law. Moreover, when viewed in its

---

[5] The fact that it was later determined via VIN number that the red Ford Expedition stopped by Trooper Rauenhorst was not the same vehicle as the Expedition stopped earlier in Colorado does not affect the Court's analysis.

entirety, the language in *Yousif* relied on by Defendant actually supports the stop in this case:

> Where law enforcement officers are not acting for a special purpose such as patrolling the borders or *roadway safety*, it is unreasonable under the Fourth Amendment to stop a vehicle and detain its driver to check his or her license and registration, unless the officers have at least articulable and reasonable suspicion that the driver is not licensed, that the automobile is not registered, or that the automobile or one of its occupants is otherwise subject to seizure for a violation of the law.

*Id.* at 828 (emphasis added).  Trooper Rauenhorst testified that, at the time he stopped the Expedition, he was monitoring traffic for, among other things, compliance with Minnesota's traffic laws.

Although not entirely clear on this point, Defendant next asserts that "pretextual searches are improper, such as here, where [Trooper Rauenhorst] intentionally treated the Amer[aCard] ID as a driver's license or government-issued ID."  (Def.'s Mem. in Supp. at 14.)  According to Defendant, "[u]nder [Trooper Rauenhorst's] logic, any foreigner whose legitimate and valid driver's license does not run through his computer, he is then justified to escalate the traffic stop."  (*Id.*)  Whatever Trooper Rauenhorst's subjective beliefs about Defendant's Mexican driver's license, the objective fact remains that he was unable to verify Defendant's identity because he could neither confirm the validity of Defendant's non-governmental identification card nor his Mexican driver's license. Reasonable suspicion is based on objective facts, not an officer's subjective opinions. *United States v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993); *see United States v. Roggeman*, 279 F.3d 573, 580 n.5 (2002) (Supreme Court case law "foreclose[s the] argument by a

criminal defendant that an otherwise-justified search and seizure violates the Fourth Amendment because the legal justification—such as the probable cause arising from a minor traffic violation and justifying a traffic stop—was simply a pretext for law-enforcement officers to investigate their hunches regarding criminal activities unrelated to that legal justification").   Trooper Rauenhorst's inability to confirm Defendant's identity, taken together with his other observations and in light of his training and experience, provided an objective basis for his reasonable suspicion.

Finally, Defendant relies on Minn. R. Crim. P. 6.01, subd. 1, which requires law enforcement to issue a citation and release a defendant in misdemeanor cases unless certain circumstances are present, to support of his argument that the continued detention was unreasonable.   (Def.'s Mem. in Supp. at 15-16.)   Whether Trooper Rauenhorst complied with Minn. R. Crim. P. 6.01 is irrelevant, however, because

> [f]ederal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations.   When evidence obtained by state law enforcement officers is offered in a federal prosecution, the legality of the search and seizure is not determined by reference to a state statute, but rather is resolved by Fourth Amendment analysis.

*United States v. Kelley*, 652 F.3d 915, 917 (8th Cir. 2011) (quotations and citation omitted); *accord United States v. Faulkner*, No. 14-cr-05 (JNE/TNL), 2014 WL 3384687, at *8 (D. Minn. July 10, 2014) ("It is a firmly established principle that 'federal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations.'" (quoting *United States v. Appelquist*, 145 F.3d 976, 978 (8th Cir. 1998)).   Thus, the Court agrees with the Government that, "even if [Trooper

Rauenhorst] violated a Minnesota rule of criminal procedure, the evidence obtained from the [Expedition] is not subject to suppression in this federal proceeding because [Trooper Rauenhorst] did not violate the Fourth Amendment." (Gov't's Opp'n at 20.)

In sum, the Court concludes that Trooper Rauenhorst did not unreasonably expand the scope of this traffic stop. The driver-identification component of this particular stop was more time consuming because of Trooper Rauenhorst's difficulty in confirming Defendant's identity. While Trooper Rauenhorst was engaged in this and other routine tasks attendant to the stop, he made several observations which taken together, in light of his training and experience, gave rise to reasonable suspicion that criminal activity was afoot.

### C. Consent to Search

Alternatively, Defendant argues that Valencia's consent to search the Expedition was not voluntary. (Def.'s Mem. in Supp. at 16-18.)

As an initial matter, it is questionable whether *Defendant's* Fourth Amendment rights were actually implicated by the search of *Valencia's* Expedition. "The United States Supreme Court has explicitly determined that a person has no reasonable expectation of privacy in an automobile belonging to another." *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (citing *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978)). Similarly, "'[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" *United States v. Douglas*, 744 F.3d 1065, 1071 (8th Cir. 2014) (quoting *Rakas*, 439 U.S. at 134). Because

the Court determines that Valencia's consent was valid, the Court need not address whether a vehicle's non-owner driver has a reasonable expectation of privacy sufficient to challenge the validity of a physically present owner's consent to search.

"Consensual encounters, of course, do not implicate the Fourth Amendment." *Beck*, 140 F.3d at 1135. Once the purpose of a traffic stop is complete, further detention of the driver or the vehicle is unreasonable unless, as discussed above, there is reasonable suspicion to justify further detention or the continued encounter is consensual. *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007). "If consensual, the continued encounter is not considered a seizure, the Fourth Amendment is not implicated, and the officer is not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle. . . . [W]hether an encounter is consensual depends upon the unique factual nature of each case." *Id.* Further, "[w]hether or not the [individual] has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *Guerrero*, 374 F.3d at 588 (quotation omitted). "The focus is not whether [the individual] subjectively consented, but rather, whether a reasonable officer would believe consent was given and can be inferred from words, gestures, or other conduct." *Id.*

After trying to verify Defendant's identity without success, Trooper Rauenhorst returned Defendant's identification and gave Defendant a written warning for the suspended objects, which he handed to Valencia. In response to Trooper Rauenhorst's question about whether there was anything illegal in the Expedition, Valencia volunteered that Trooper Rauenhorst could search the vehicle, telling him that there was

27

nothing illegal and he could "go ahead and check." (Gov't Ex. 1, DVD 1.) There was no insinuation, as Defendant contends, that Trooper Rauenhorst "would let them go without further delay if they would consent to the search." (Def.'s Mem. in Supp. at 17.) Valencia invited Trooper Rauenhorst to search her vehicle before Trooper Rauenhorst even had the opportunity to ask.[6]

"Consent is voluntary if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *Flores*, 474 F.3d at 1104 (quotation omitted). As the Government points out, "the traffic stop occurred on a well-traveled public highway, during daylight, and Valencia was not alone. She was not under arrest or handcuffed when she gave consent, and all parties were standing outside. Trooper Rauenhorst did not have his weapon drawn, nor was his [canine] out of the vehicle." (Gov't's Opp'n at 21-22*.) See Flores*, 474 F.3d at 1104 (listing factors to consider with respect to both the person giving the alleged consent and the environment in which the alleged consent was given when evaluating voluntariness). Valencia was given a consent-to-search form that advised her of her rights in both English and Spanish. Valencia spoke to Trooper Rauenhorst in English and confirmed that she was able to read both languages and signed the form. Neither she nor Defendant was threatened, intimidated, or made any promises or misrepresentations by Trooper

---

[6] The Court recognizes that, had Valencia not invited Trooper Rauenhorst to search the Expedition, Trooper Rauenhorst would have likely asked to search the vehicle given that, when he gave Defendant and Valencia the warning, he brought a consent-to-search form with him that had been partially completed. What might have happened, however, does not change the fact that Valencia invited Trooper Rauenhorst to search the Expedition before he asked her permission to do so.

Rauenhorst or the trooper that subsequently arrived to assist. *See id.* There is no evidence that Valencia was intoxicated or under the influence of drugs. *See id.*

Moreover, the fact that Trooper Rauenhorst did not specifically tell Defendant and Valencia that they could leave does not establish that the conversation was not consensual. *United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001). Valencia's questions voluntarily prolonged the encounter. Trooper Rauenhorst had already given Defendant back his identification and issued the warning. Defendant and Valencia had everything they needed to proceed on their way. In fact, Trooper Rauenhorst confirmed with Valencia that she and Defendant had received "everything back." (Gov't Ex. 1, DVD 1.) Yet, Valencia continued to converse with Trooper Rauenhorst, seeking further clarification regarding the reason they had been stopped. *See Quintero-Felix*, 714 F.3d at 568 (driver consented to continuation of encounter where, after officer had given him a written warning, returned his identification, told him he was free to leave, and driver had opened door of squad, driver "responded [to officer's inquiry if he could ask a few questions] by closing the door, remaining in the vehicle, and answering additional questions"); *Flores*, 474 F.3d at 1103-04 (encounter was consensual when driver's documents had been returned to him and a warning issued, was told he was free to go, and was in the process of exiting patrol car when officer inquired if he could ask a few more questions); *cf. Guerrero*, 374 F.3d at 589-90 (despite trooper's return of driver's papers, driver's "inability to understand English, [trooper's] statement 'before you take off,' and the fact that [trooper] continued to talk to [driver] and ask questions while [driver] was sitting in the back seat of the patrol car would reasonably lead a person in

similar circumstances to believe that they were not yet free to leave").  It was during this continued conversation that Valencia invited Trooper Rauenhorst to search the vehicle.

Based on the foregoing, a reasonable officer would have believed that Valencia consented to the search of the Expedition.  To the extent that Defendant argues Valencia's consent was involuntary based on improper escalation of the traffic stop, this argument is without merit for the reasons previously stated.

### III.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

### RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (ECF No. 17) be **DENIED**.

Date: September ____19____, 2014

_s/ Tony N. Leung_
Tony N. Leung
United States Magistrate Judge
for the District of Minnesota

_United States v. Jaime-Perez_
File No. 14-cr-0233(2) (ADM/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **October 6, 2014**.